

**FILED** (ST)
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JAN 1 6 2002  ★

LONG ISLAND OFFICE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

EILEEN A. SCHIEBL,
individually and on behalf
of all others similarly situated ,                    :

       **Plaintiff,**                    :

v.                    :

                                               :

INCORPORATED VILLAGE OF PATCHOGUE
NEW YORK,                    :
F. TALDONE, individually and in his
capacity as constable,                    :
MARY PONTIERI, individually and in her
capacity as former Village of Patchogue clerk,      :
TODD C. JOHNSON, individually and in his
capacity as former Village of Patchogue treasurer,  :
ROSE MARIE BERGER, individually and in her
capacity as former Village of Patchogue clerk,      :
DEIDRE O'BRIEN, individually and in her
capacity as constable,                    :
STEPHEN KEEGAN, individually and in his
capacity as former mayor of Patchogue,              :
JEFFREY KRACHT, individually and in his
capacity as former chief constable,                 :
NANCY AUER, individually and in her
capacity as Village of Patchogue Justice Court clerk, :
LOUIS TOMEO, individually and in his
capacity as chief constable,                    :
VINCENT YANNACONE, JR, individually and in his  :
capacity as Judge of the Village of Patchogue Justice
Court,                    :
GAIL REILLY, individually and in her
capacity as Village of Patchogue Justice Court clerk, :
RICHARD COLLOCOLA, individually and in his
capacity as Village of Patchogue clerk,             :
PATRICK O'CONNELL, individually and in his
capacity as Justice of the Village of Patchogue Justice :
Court,                    :
DEBORAH GUSTAM, individually and in her capacity :
as Clerk of the Village of Patchogue Justice Court,   :

WEXLER, J.

LINDSAY, M.

Civil Action
No.

**CV 02 0297**

CLASS ACTION
COMPLAINT

<u>TRIAL BY JURY
DEMANDED.</u>

| | |
|---|---|
| **EDWARD IHNE, individually and in his capacity as Mayor of Patchogue and in his capacity as former village trustee,** | : |
| **JERRY AVELLINO, individually and in his capacity as constable,** | : |
| **SALVATORE BARBARA,  individually and in his capacity as constable,** | : |
| **NICHOLAS CHIRILLO, individually and in his capacity as constable,** | : |
| **ALEXANDER COSTELLO, individually and in his capacity as constable,** | : |
| **FRANCES CUOZZO, individually and in her capacity as constable,** | : |
| **RICHARD DEBETTA, individually and in his capacity as constable,** | : |
| **BARRY DONADIO, individually and in his capacity as constable,** | : |
| **MICHAEL DONOVICH, individually and in his capacity as constable,** | : |
| **DANIEL DURINICK, individually and in his capacity as constable,** | : |
| **SCOTT ECKERT, individually and in his capacity as constable,** | : |
| **ERICK EVRLY, individually and in his capacity as constable,** | : |
| **RICHARD FIORUCCI, individually and in his capacity as constable,** | : |
| **CASTO GONZALEZ, individually and in his capacity as constable,** | : |
| **WILLIAM B. HART, individually and in his capacity as constable,** | : |
| **DONALD HENDERSON, individually and in his capacity as constable** | : |
| **RANALD HOLCOMBE, individually and in his capacity as constable,** | : |
| **GERALD LENOX, individually and in his capacity as constable,** | : |
| **WILLIAM LOGAN, individually and in his capacity as constable,** | : |
| **KARL MAKINEN, individually and in his capacity as constable,** | : |
| **PETER MARKS, individually and in his capacity as constable,** | : |

**RICHARD MATSON, individually and in his capacity** :
**as constable,**
**ERICK MCFARLAN, individually and in his capacity** :
**as constable,**
**JAMES NUDO, individually and in his capacity as** :
**constable,** :
**BRIAN PANUCCIO, individually and in his capacity** :
**as constable,**
**KEVIN PETERSON, individually and in his capacity** :
**as constable,**
**SUSAN RALPH, individually and in her capacity as** :
**constable,** :
**STEPHEN E. RAMSLAND, individually and in his** :
**capacity as constable,** :
**FERDINANDO SABELLICHI, individually and in his** :
**capacity as constable,** :
**COSMO STOIA, individually and in his capacity as** :
**constable,** :
**LUIS VELEZ, individually and in his capacity as code** :
**enforcement officer,** :
**BASIL WATTLEY, individually and in his capacity as** :
**constable,** :
**JOSEPH WOOD, individually and in his capacity as** :
**constable,** :
**NICHOLAS ZAMBELLI, individually and in his** :
**capacity as constable,** :
**JOHN DOE, a fictitious name, who is intended to** :
**be the Patchogue Village constable who detained the** :
**named plaintiff, in both his individual and official** :
**capacities,** :
:
**Defendants.** :
-------------------------------------------------------------------------x

## CLASS ACTION COMPLAINT

Plaintiff Eileen A. Schiebl, on behalf of herself and a class of similarly situated

persons for whom she brings this action, files this Class Action Complaint against Defendants

Village of Patchogue; F. Taldone, individually and in his official capacity as Patchogue

constable; Mary Pontieri, individually and in her official capacity as former Patchogue clerk;

3

Todd C. Johnson, individually and in his official capacity as former Village of Patchogue

Treasurer; Vincent Yannacone, Jr., individually and in his official capacity as Judge of the

Patchogue Village Justice Court; Stephen Keegan, individually and in his official capacity as

former mayor of Patchogue; Deborah Gustam, individually and in her capacity as Clerk of the

Village of Patchogue Justice Court; Edward Ihne, individually and in his official capacity as

Mayor of the Village of Patchogue; Patrick O'Connell, individually and in his official capacity as

Judge of the Patchogue Village Justice Court; Gail Reilly, individually and in her official

capacity as Clerk of the Village of Patchogue Justice Court; Nancy Auer, individually and in her

official capacity as Clerk of the Village of Patchogue Justice Court; Rose Marie Berger,

individually and in her official capacity as former Patchogue clerk; Deidre O'Brien, individually

and in her official capacity as Patchogue constable; Richard Collocola, individually and in his

official capacity as Patchogue clerk; Jeffrey T. Kracht, individually and in his official capacity as

former Patchogue chief constable; Louis Tomeo, individually and in his official capacity as

former Patchogue chief constable; Jerry Avellino, individually and in his official capacity as

Patchogue constable; Salvatore Barbara,  individually and in his official capacity as Patchogue

constable; Nicholas Chirillo, individually and in his official capacity as Patchogue constable;

Alexander Costello, individually and in his official capacity as Patchogue constable; Frances

Cuozzo, individually and in her official capacity as Patchogue constable; Richard DeBetta,

individually and in his official capacity as Patchogue constable; Barry Donadio,  individually and

in his official capacity as Patchogue constable; Michael Donovich, individually and in his official

capacity as Patchogue constable; Daniel Durinick,  individually and in his official capacity as

Patchogue constable; Scott Eckert, individually and in his official capacity as Patchogue

4

constable; Erick Evrly, individually and in his official capacity as Patchogue constable; Richard

Fiorucci, individually and in his official capacity as Patchogue constable; Casto Gonzalez,

individually and in his official capacity as Patchogue constable; William B. Hart, individually

and in his official capacity as Patchogue constable; Donald Henderson, individually and in his

official capacity as Patchogue constable; Ranald Holcombe, individually and in his official

capacity as Patchogue constable; Gerald Lenox, individually and in his official capacity as

Patchogue constable; William Logan, individually and in his official capacity as Patchogue

constable; Karl Makinen, individually and in his official capacity as Patchogue constable; Peter

Marks, individually and in his official capacity as Patchogue constable; Richard Matson,

individually and in his official capacity as Patchogue constable; Erick McFarlan, individually and

in his official capacity as Patchogue constable; James Nudo, individually and in his official

capacity as Patchogue constable; Brian Panuccio, individually and in his official capacity as

Patchogue constable; Kevin Peterson, individually and in his official capacity as Patchogue

constable; Susan Ralph, individually and in her official capacity as Patchogue constable; Stephen

Ramsland, individually and in his official capacity as Patchogue constable; Ferdinando

Sabellichi, individually and in his official capacity as Patchogue constable; Cosmo Stoia,

individually and in his official capacity as Patchogue constable; Luis Velez, individually and in

his official capacity as Patchogue constable; Basil Wattley, individually and in his official

capacity as Patchogue constable; Joseph Wood, individually and in his official capacity as

Patchogue constable; Nicholas Zambelli,  individually and in his official capacity as Patchogue

constable, and John Doe, a fictitious name, who is intended to be the Patchogue village constable

constable who detained the named plaintiff, in both is individual and official capacities,. In support of her Complaint, Plaintiff alleges and states as follows:

### Jurisdiction and Venue

1.    The claims asserted herein arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the laws of the State of New York.  Plaintiff seeks injunctive relief to end the Defendants' scheme of running an illegal, illegitimate private police force, appointment of a federal monitor to oversee dismantling of the Defendants' illegal scheme, compensatory and punitive damage sustained as a result of the Defendants' conduct, and treble damages, along with the costs of this suit, interest, reasonable attorney's fees, and other ancillary relief.  The Court has jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The Court further has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.    The Court has jurisdiction over Defendants because the unlawful practices alleged in this Complaint were committed, in whole or in part, in the Eastern District of New York.  In addition, Defendants each have minimum contacts with the Eastern District of New York and the State of New York, or are subject to this Court's jurisdiction pursuant to 18 U.S.C. § 1964.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Suffolk County, New York, which is in the Eastern District of New York.

## The Parties

4.     Plaintiff Eileen A. Schiebl ("Schiebl") is a New York resident residing in Holtsville, New York.

5.     Defendant Village of Patchogue ("Patchogue") is a self-governing village as defined in the New York Village Law.

6.     Defendant F. Taldone ("Taldone") is an individual who resides in the State of New York. Taldone has served as a "constable" for Patchogue and, upon information and belief, has held himself out as a police officer.

7.     Defendant Mary Pontieri ("Pontieri") is an individual who formerly served as Patchogue Village clerk.  Pontieri resides in the State of New York.

8.     Defendant Vincent Yannacone, Jr.  ("Yannacone") is an individual who resides in the State of New York.  Yannacone, an attorney licensed to practice law in the State of New York, presides over the Patchogue village justice court and, upon information and belief, also acted in concert with the other defendants in policy matters outside the justice court. In his actions as described herein, Yannacone acted outside his jurisdiction and/or authority as a village justice.  Plaintiff is seeking damages from Yannacone in his individual capacity for monies had and received, and is also seeking both a declaratory judgment and prospective injunctive relief applicable to him.

9.     Defendant Todd C. Johnson ("Johnson") is an individual who served as a Patchogue Village treasurer. Johnson resides in the State of New York.

10.    Defendant Rose Marie Berger ("Berger") is an individual who formerly served as a Patchogue Village clerk.   Berger resides in the State of New York.

11.     Defendant Deidre O'Brien ("O'Brien") is an individual who resides in the State of New York. O'Brien is a "constable" for Patchogue who holds herself out as a "law enforcement officer".

12.     Defendant Louis Tomeo ("Tomeo") is an individual residing in the State of New York. Tomeo is chief constable of Patchogue.

13.     Defendant Richard Collocola ("Collocola") is an individual who serves as Patchogue Village clerk. Collocola resides in the State of New York.

14.     Defendant Jeffrey T. Kracht ("Kracht") is an individual who resides in the State of New York. Kracht is the former Chief Constable for Patchogue who, upon information and belief, held himself out as a police officer.

15.     Defendant Edward Ihne ("Ihne") is an individual who resides in the State of New York. Ihne is the Mayor of the Village of Patchogue and a former village trustee.

16.     Defendant Gail Reilly ("Reilly") is an individual who resides in the State of New York. Reilly is Clerk of the Village of Patchogue Justice Court

17.     Defendant Stephen Keegan ("Keegan") is an individual who resides in the State of New York. Keegan is the former mayor of Patchogue

18.     Defendant Nancy Auer ("Auer") is an individual who resides in the State of New York. Auer is the Clerk of the Village of Patchogue Justice Court.

19.     Defendant Deborah Gustam ("Gustam") is an individual who resides in the State of New York. Gustam is the Senior Justice Court Clerk of the Village of Patchogue.

20.     Defendant Patrick O'Connell ("O'Connell") is an individual who resides in the State of New York. O'Connell, an attorney licensed to practice law in the State of New York,

8

presides over the Patchogue village justice court and also acted in concert with the other defendants in policy matters outside the justice court.   In all his actions as described herein, O'Connell acted outside his jurisdiction and/or authority as a village justice. Plaintiff is not seeking damages from O'Connell but is seeking both a declaratory judgment and prospective injunctive relief applicable to him.

21.     Defendant Jerry Avellino ("Avellino) is a resident of the State of New York.  Avellino is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

22.     Defendant Salvatore Barbara ("Barbara") is a resident of the State of New York.  Barbara is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

23.     Defendant Nicholas Chirillo ("Chirillo") is a resident of the State of New York.  Chirillo is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

24.     Defendant Alexander Costello ("Costello") is a resident of the State of New York. Costello is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

25.     Defendant Frances Cuozzo ("Cuozzo") is a resident of the State of New York.  Cuozzo is a "constable" for Patchogue who, upon information and belief, holds herself out as a "police officer".

26.     Defendant Richard DeBetta ("DeBetta") is a resident of the State of New York. DeBetta is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

27.     Defendant Barry Donadio ("Donadio") is a resident of the State of New York.  Donadio is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

28.     Defendant Michael Donovich ("Donovich") is a resident of the State of New York. Donovich is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

29.     Defendant Daniel Durinick ("Durinick") is a resident of the State of New York.  Durinick is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

30.     Defendant Scott Eckert ("Eckert") is a resident of the State of New York.  Eckert is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

31.     Defendant Erick Evrly ("Evrly") is a resident of the State of New York.  Evrly is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

32.     Defendant Richard Fiorucci ("Fiorucci") is a resident of the State of New York.  Fiorucci is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

10

33.    Defendant Casto Gonzalez ("Gonzalez") is a resident of the State of New York. Gonzalez is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

34.    Defendant William Hart ("Hart") is a resident of the State of New York.  Hart is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

35.    Defendant Donald Henderson ("Henderson") is a resident of the State of New York. Henderson is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

36.    Defendant Ranald Holcombe ("Holcombe") is a resident of the State of New York. Holcombe is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

37.    Defendant Gerald Lenox ("Lenox") is a resident of the State of New York.  Lenox is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

38.    Defendant William Logan ("Logan") is a resident of the State of New York.  Logan is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

39.    Defendant Karl Makinen ("Makinen") is a resident of the State of New York.  Makinen is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

40.     Defendant Peter Marks ("Marks") is a resident of the State of New York.  Marks is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

41.     Defendant Richard Matson ("Matson") is a resident of the State of New York.  Matson is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

42.     Defendant Erick McFarlan ("McFarlan") is a resident of the State of New York.  McFarlan is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

43.     Defendant James Nudo ("Nudo") is a resident of the State of New York.  Nudo is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

44.     Defendant Brian Panuccio ("Panuccio") is a resident of the State of New York.  Panuccio is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

45.     Defendant Kevin Peterson ("Peterson") is a resident of the State of New York.  Peterson is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

46.     Defendant Susan Ralph ("Ralph") is a resident of the State of New York.  Ralph is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

12

47.   Defendant Stephen Ramsland ("Ramsland") is a resident of the State of New York. Ramsland is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

48.   Defendant Ferdinando Sabellichi ("Sabellichi") is a resident of the State of New York. Sabellichi is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

49.   Defendant Cosmo Stoia ("Stoia") is a resident of the State of New York. Stoia is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

50.   Defendant Luis Velez ("Velez") is a resident of the State of New York. Velez is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

51.   Defendant Basil Wattley ("Wattley") is a resident of the State of New York. Wattley is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

52.   Defendant Joseph Wood ("Wood") is a resident of the State of New York. Wood is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

53.   Defendant Nicholas Zambelli ("Zambelli") is a resident of the State of New York. Zambelli is a "constable" for Patchogue who, upon information and belief, holds himself out as a "police officer".

54.     Defendant John Doe ("Doe") is an individual, whose name is unknown to plaintiff, who is intended to be the Patchogue Village Constable who detained the named plaintiff, who, upon information and believe, holds himself out as a "police officer".

55.     At all times pertinent to the allegations of this Complaint, the Defendants were acting in concert with, or under the direction and control of, each other.

56.     The acts committed by the Defendants as alleged herein were done by them personally and/or in their official capacity, either while present in, or by the use of the mails, telephones, and other instrumentalities in interstate commerce to and from the State of New York and elsewhere.

57.     The acts of each Defendant are deemed to be the acts of, and are chargeable to and binding upon, every other Defendant.

### Nature of the Action

58.     This case involves a continuing enterprise by and through which the Defendants created a private police force, purportedly cloaked with legitimate public authority, in an effort to reap financial gains and other valuable personal benefits for themselves at the expense of persons residing in and/or traveling through Patchogue.  This action is intended to put a stop to these repetitive illegal practices.  Plaintiff seeks, *inter alia*, an injunction bringing these illegal activities to an end, an appointment of a federal monitor to oversee the dismantling of the Defendants' scheme, compensation for their damages, and an award of punitive damages to deter future illegal conduct by the Defendants and others, and reasonable attorney's fees.

14

## Class Action Allegations

59.    This is a class action brought on behalf of all persons (the "Class") who, from January 16, 1996 to the present (the "Class Period"):

(a)    have been detained, restrained, or arrested by persons purporting to be police officers and/or constables of Patchogue,

(b)    have been detained, restrained, or arrested by persons purporting to be police officers and/or constables of Patchogue and have received what purport to be traffic tickets from persons purporting to be police officers and/or constables of Patchogue during the Class Period, and/or

(c)    who have paid or been asked to pay amounts of money to Patchogue in relation to traffic tickets issued by persons purporting to be police officers in Patchogue during the Class Period after having been detained by persons purporting to be police officers and/or constables of Patchogue and receiving what purport to be traffic or appearance tickets from persons purporting to be police officers and/or constables of Patchogue.

60.    This class action alleges civil rights violations, common law money had and received, and violations of RICO arising from the creation and continuing operation of a private police force purporting to be a legitimate exercise of the governmental authority of Patchogue.

61.    This action is brought pursuant to Federal Rule of Civil Procedure 23.  The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

62.    The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members can be determined only by

15

appropriate discovery, Plaintiff believes that members of the Class number in the tens of thousands.

63.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the other members of the Class sustained damages as a result of Defendants' wrongful conduct complained of herein.

64.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in this type of complex federal litigation.

65.     The class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiff and members of the Class individually to seek redress for the wrongful conduct alleged.

66.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Defendants' conduct constitutes violations of the Plaintiff's civil rights;

(b)     whether the Defendants' activities constitute RICO violations;

(c)     whether Defendants received money belonging to Plaintiff, benefitted from the receipt of that money, and under principles of equity and good conscience, Defendants should not be permitted to keep the money; and

(d)     whether the members of the Class have sustained damages and, if so, the appropriate measure thereof.

67.   Notice can be provided to the Class by means of publication of a form of notice similar to those customarily used in other class action litigations.

68.   Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

### Facts

**A.     Patchogue Irrevocably Transfers All its Law Enforcement Authority to Suffolk County.**

69.   Chapter 278 of the Laws of New York of 1958 authorized a charter form of government for Suffolk County, where Patchogue is located.  One of the features of the law was the creation of a Suffolk County police district.  Establishment of the police district was subject to a referendum and was contingent on the approval of the voters in unincorporated territories of three or more contiguous towns.  Voters within the territory of any incorporated villages within contiguous towns, like Patchogue, could also elect to become part of the police district.  The law expressly provided that the election was irrevocable.

70.   Upon information and belief, some years before the beginning of the class period, Patchogue voters agreed to transfer the village's police functions to Suffolk County or, in the alternative, Patchogue was legally bound by approval of the majority of voters in the town of Brookhaven to transfer those police functions and centralize them in the Suffolk County police district.  Since that time, the Suffolk County police department has

17

developed into a large and well-trained force, with a well-respected police academy and high standards of competency and professionalism.

71.     After a series of court decisions by the New York State appellate courts concerning the legal effect of the approval of the Suffolk County Police District, these Defendants received notice, prior to the acts complained of herein, that the Village had no authority to perform traffic or law enforcement functions.

72.     The lawfully constituted law enforcement agency for the geographic area known as Patchogue is the Suffolk County police department.

**B.      Despite This Transfer of Authority, Defendants Create a Scheme to Maintain an Unauthorized, Illegal Patchogue Police Force.**

73.     Despite having transferred all police authority, in or about 1991 the Defendants created a scheme purporting to maintain a separate Patchogue police force. Patchogue employed persons purporting to be village "constables" to perform police functions, including detaining and arresting "suspects" under color of law and purporting to enforce the New York Vehicle and Traffic Law and Patchogue local ordinances within the geographical limits of Patchogue.  These "constables" are part of a scheme created by the Defendants that includes the constables (who hold themselves out as police officers), village officials, and village clerks, that is designed to detain individuals traveling through Patchogue, issue purported New York traffic tickets, also called "appearance tickets," hold village-court sessions to adjudicate the purported traffic tickets that constituted acts outside the village court's jurisdiction, assess unlawful fines and/or court costs, threaten consequences if the unlawful fines were not paid, and collect unlawful fines and costs, all

18

to the personal benefit of the Defendants. (the "Patchogue Private Police Force Scheme" or the "Scheme").

74.     Unlike Suffolk County police officers, Patchogue's "constables" are not trained through a police academy or otherwise approved by the state or any other agency charged with qualifying law enforcement officials. The "constables" also do not have civil service certification to perform law-enforcement functions and carry firearms under the New York Civil Service Law. Despite their lack of training, upon information and belief, Patchogue purchased and armed these "constables" with weapons and, because these "constables" were not qualified as law enforcement officials, the "constables," as part of the scheme, obtained civilian weapons permits even though their actual intention was to carry those guns as if they were law enforcement officials acting under color of law. Upon information and belief, Patchogue "constables" do not receive any emergency vehicle training or weapons training and certification.

   **C.     The Individual Defendants' Involvement in the Scheme.**

75.     Ihne, who has been serving as mayor of Patchogue since April, 2000, and prior to that time was a Village trustee, has overseen the Patchogue Private Police Force Scheme and, along with other Defendants, became involved in the Scheme since the beginning of the class period. Ihne and the other individual defendants knew at all times that Patchogue had irrevocably assigned all its police authority to Suffolk County and had been notified on multiple occasions by the authorities that it could not exercise police authority. Ihne has been personally involved in the management and control of the Scheme throughout the Class Period, and Ihne has personally benefitted from the Scheme, but including, not

limited to, deriving income from the scheme. Ihne used his position at the highest policy-making levels of the Patchogue village government to procure funding for the Scheme, approved and/or supplied the Scheme with uniforms, vehicles, weapons, emblems, equipment, and other items necessary to facilitate operation of the scheme. Ihne used his position as a Patchogue official to wield power for his personal benefit. By these actions, Ihne committed or attempted to commit larceny by extortion, by violating New York Penal Law §190.65 (1) (1) Scheme to Defraud, a felony under New York Penal Law §190.65 (1)(a), which carries a penalty in excess of one year in jail. Ihne engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons, or to obtain property from ten or more persons, by false or fraudulent pretenses, representations, or promises. Ihne also committed or attempted to commit further predicate acts involving extortion by violating New York Penal Law § 155.40 Grand Larceny in the Second Degree, a felony under New York Penal Law §155.40(2)(c), which carries a penalty in excess of one year in jail. Ihne stole or attempted to steal property through extortion by instilling a fear that he or another person will use or abuse his position as a public servant by engaging in conduct within or related to his official duties, or by failing or refusing to perform an official duty, in such a manner as to affect some person adversely. Ihne was also an accomplice to criminal impersonations by village personnel acting as police officers, mail and wire fraud, filing false instruments, extortion, and other illegal and improper activities. Ihne used his position as mayor of Patchogue to communicate with Suffolk County officials to allow payment to members of

20

the scheme through the civil service system even though payment of persons for unauthorized activity was prohibited.

76.  Keegan, who served from April 1996 until April, 2000 as mayor of Patchogue immediately prior to Ihne assuming that office, oversaw the Patchogue Private Police Force Scheme and, along with other Defendants, became involved in the Scheme. Keegan and the other individual defendants  knew at all times that Patchogue had irrevocably assigned all its police authority to Suffolk County and had been notified on multiple occasions by the County and State that it could not exercise police authority. Keegan has been personally involved in the management and control of the Scheme through most of the Class Period, and Keegan has personally benefitted from the Scheme including, but not limited to, deriving income from the scheme.  Keegan used his position at the highest policy-making levels of the Patchogue village government to procure funding for the Scheme, and approved and/or supplied the Scheme with uniforms, vehicles, weapons, emblems, equipment, and other items necessary to facilitate operation of the scheme. Keegan used his position as an Patchogue official to wield power for his personal benefit. By these actions, Keegan committed or attempted to commit larceny by extortion, by violating New York Penal Law §190.65 (1) (1) Scheme to Defraud, a felony under New York Penal Law §190.65 (1)(a), which carries a penalty in excess of one year in jail. Keegan engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons, or to obtain property from ten or more persons, by false or fraudulent pretenses, representations, or promises.  Keegan also committed or attempted to commit further predicate acts involving extortion by violating New York

21

Penal Law § 155.40 Grand Larceny in the Second Degree, a felony under New York

Penal Law §155.40(2)(c), which carries a penalty in excess of one year in jail. Keegan

stole or attempted to steal property through extortion by instilling a fear that he or another

person will use or abuse his position as a public servant by engaging in conduct within or

related to his official duties, or by failing or refusing to perform an official duty, in such a

manner as to affect some person adversely. Keegan was also an accomplice to criminal

impersonations by village personnel acting as police officers, mail and wire fraud, filing

false instruments, extortion, and other illegal and improper activities. Keegan used his

position as mayor of Patchogue to communicate with Suffolk County officials to allow

payment of members of the scheme through the civil service system even though payment

of persons for unauthorized activity was prohibited.

77.    Kracht, who served as the former "Chief Constable" of Patchogue from on or about 1998

to June 2000, along with other Defendants, became involved in the Scheme. Kracht and

the other individual defendants knew at all times that Patchogue had irrevocably assigned

all its police authority to Suffolk County and had been notified on multiple occasions that

it could not exercise police authority. Kracht has represented himself as a "constable"

and as a legitimate law enforcement officer even though he is not recognized under New

York law as a police officer or otherwise legitimately empowered to enforce any laws by

wearing and/or displaying a uniform, badge or insignia by which police officers are

lawfully distinguished, and through his words or actions representing that he was acting

with the authority or approval of a legitimate police department, with intent to induce

others to submit to such pretend authority, or act in reliance thereon, and in the course of

22

such pretense committing or attempting to commit the crime of Scheme to defraud, a felony under New York Penal Law §190.65 (1)(a) which carries a penalty in excess of one year in jail, by engaging in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons, or to obtain property from ten or more persons, by false or fraudulent pretenses, representations, or promises; and also in the course of such pretense committing, and/or attempting to commit the crime of Grand Larceny in the second degree, a felony under New York Penal Law §155.40(2)(c) which carries a penalty in excess of one year in jail, by stealing property through extortion committed by instilling a fear that he or another person will use or abuse his position as a public servant by engaging in conduct within or related to his official duties, or by failing or refusing to perform an official duty, in such a manner as to affect some person adversely.  Kracht has been personally involved in the management and control of the Scheme throughout the Class Period, including, upon information and belief, detaining persons traveling through Patchogue and issuing purported citations to persons traveling through Patchogue.  In addition, by these acts, Kracht was also an accomplice to criminal impersonations by village personnel acting as police officers, mail and wire fraud, filing false instruments, extortion, and other illegal and improper activities. Kracht used his position as a Patchogue official to wield power for his personal benefit, and Kracht has personally benefitted from the Scheme including, not limited to, deriving income from the scheme.

78.     Tomeo, who has served since June, 2000 to the present day as the  "Chief Constable" of Patchogue, along with other Defendants, became involved in the Scheme. Tomeo and the

23

other individual defendants knew at all times that Patchogue had irrevocably assigned all its police authority to Suffolk County and had been notified on multiple occasions by the authorities that it could not exercise police authority. During much of the Class Period, Tomeo was engaged in criminal impersonation of a police officer. Tomeo has represented himself as a "constable" and as a legitimate law enforcement officer even though he is not recognized under New York law as a police officer or otherwise legitimately empowered to enforce any laws, by wearing and/or displaying a uniform, badge or insignia by which police officers are lawfully distinguished, and through his words or actions representing that he was acting with the authority or approval of a legitimate police department, with intent to induce others to submit to such pretend authority, or act in reliance thereon, and in the course of such pretense committing or attempting to commit the crime of Scheme to Defraud, a felony under New York Penal Law §190.65 (1)(a) which carries a penalty in excess of one year in jail, by engaging in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons, or to obtain property from ten or more persons, by false or fraudulent pretenses, representations, or promises; and also in the course of such pretense committing, and/or attempting to commit the crime of Grand Larceny in the Second Degree, a felony under New York Penal Law §155.40(2)(c), which carries a penalty in excess of one year in jail, by stealing property through extortion committed by instilling a fear that he or another person will use or abuse his position as a public servant by engaging in conduct within or related to his official duties, or by failing or refusing to perform an official duty, in such a manner as to affect some person adversely. Tomeo has

24

been personally involved in the management and control of the Scheme during at least some portion of the Class Period, and upon information and belief, Tomeo has detained persons traveling through Patchogue by means of "arrests" and issuing purported citations to persons traveling through Patchogue.  In addition, by these acts, Tomeo was also an accomplice to criminal impersonations by village personnel acting as police officers, mail and wire fraud, filing false instruments, and other illegal and improper activities Tomeo used his position as an Patchogue official to wield power for his personal benefit, and Tomeo personally benefitted from the Scheme including, not limited to, deriving income from the scheme.

79.   During much of the Class Period, Taldone was engaged in felony criminal impersonation of a police officer, grand larceny in the second degree, and/or scheme to defraud in the first degree in violation of New York Penal Law sections 190.26, 155.40(c), and 190.65 (1)(a), respectively.  Taldone and the other individual defendants knew at all times that Patchogue had irrevocably assigned all its police authority to Suffolk County and had been notified on multiple occasions by the authorities that it could not exercise police authority.  Taldone represented himself as a law enforcement officer and, upon information and belief, wore or displayed a uniform, badge, insignia, or other facsimile by which police officers are lawfully distinguished, and/or expressed by his words or actions that he was acting with approval or authority of a legitimate police department, and acted with intent to induce others to submit to such pretended official authority, or act in reliance thereon, and in the course of such pretense committing or attempting to commit the crime of Scheme to Defraud, a felony under New York Penal Law §190.65 (1)(a)

which carries a penalty in excess of one year in jail, by engaging in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons, or to obtain property from ten or more persons, by false or fraudulent pretenses, representations, or promises; and also in the course of such pretense committing, or attempting to commit the crime of Grand Larceny in the Second Degree, a felony under New York Penal Law §155.40(2)(c) which carries a penalty in excess of one year in jail, by stealing property through extortion, committed by instilling a fear that he or another person will use or abuse his position as a public servant by engaging in conduct within or related to his official duties, or by failing or refusing to perform an official duty, in such a manner as to affect some person adversely. Taldone was personally involved in the management and control of the Scheme during at least some portion of the Class Period, and Taldone detained persons traveling through Patchogue and issued purported citations and/or appearance tickets to persons traveling through Patchogue. Taldone used his position as an Patchogue official to wield power for his personal benefit, and Taldone has personally benefitted from the Scheme including, not limited to, deriving income from the scheme.

80.     For some, or most, of the Class Period, O'Brien, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe were each engaged in felony criminal impersonation of a police officer, grand larceny in the second degree, and/or scheme to defraud in the first degree in violation of

26

New York Penal Law sections 190.26, 155.40(c), and 190.65 (1)(a), respectively.

O'Brien and the other individual defendants hired by Defendant Patchogue as

"constables" knew at all times that Patchogue had irrevocably assigned all its police

authority to Suffolk County and had been notified on multiple occasions by the

authorities that it could not exercise police authority.  Throughout the Class Period,

O'Brien, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Durinick,

Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen,

Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia,

Velez, Wattley, Wood, Zambelli, and Doe represented themselves as law enforcement

officers and, upon information and belief, each wore or displayed a uniform, badge,

insignia, or other facsimile by which police officers are lawfully distinguished, and/or

expressed by their words or actions that they were acting with approval or authority of a

legitimate police department, and acted with intent to induce others to submit to such

pretended official authority, or act in reliance thereon, and in the course of such pretense

committing or attempting to commit the crime of Scheme to defraud, a felony under New

York Penal Law §190.65 (1)(a) which carries a penalty in excess of one year in jail, by

engaging in a scheme constituting a systematic ongoing course of conduct with intent to

defraud ten or more persons, or to obtain property from ten or more persons, by false or

fraudulent pretenses, representations, or promises; and also in the course of such pretense

committing, or attempting to commit the crime of Grand Larceny in the second degree, a

felony under New York Penal Law §155.40(2)(c) which carries a penalty in excess of one

year in jail, by stealing property through extortion, committed by instilling a fear that the

27

constable or another person will use or abuse their position as a public servant by

engaging in conduct within or related to their official duties, or by failing or refusing to

perform an official duty, in such a manner as to affect some person adversely. O'Brien,

Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Durinick, Eckert, Evrly,

Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks,

Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez,

Wattley, Wood, Zambelli, and Doe have represented themselves as police officers, upon

information and belief,  have detained persons traveling through Patchogue and issued

purported citations to persons traveling through Patchogue.  O'Brien, Avellino, Barbara,

Chirillo, Costello, Cuozzo, DeBetta, Donadio, Durinick, Eckert, Evrly, Fiorucci,

Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson,

McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley,

Wood, Zambelli, and Doe used their position as Patchogue officials to wield power for

their personal benefit, and O'Brien and the other individual defendants, named herein,

who have been hired by defendant Patchogue as constables have personally benefitted

from the Scheme including, but not limited to, deriving income from the scheme.

81.     Yannacone, individually and in his official capacity as Judge of the Patchogue Village

Justice Court, along with other Defendants, acting beyond the jurisdiction of the

Patchogue village court, hatched the Scheme.  Yannacone and the other individual

defendants  knew at all times that Patchogue had irrevocably assigned all its police

authority to Suffolk County and had been notified on multiple occasions by the

authorities that it could not exercise police authority.  Yannacone has been personally

28

involved in the management and control of the Scheme throughout the Class Period, including acting with other Patchogue officials to setup and maintain the Scheme, procure funding for the Scheme, and approve and/or supply the Scheme with uniforms, vehicles, weapons, emblems, equipment, and other items necessary to facilitate operation of the scheme. Yannacone has done this, upon information and belief, through his personal control of the Fleet Bank Account in his name in which all fines from the Justice Court are deposited. Yannacone, while purporting to uphold the mantel of impartiality in the exercise of his judicial role, has destroyed such through his direct control and indirect financial interest over the fines assessed in the cases he adjudicates and his role in the scheme. Yannacone used his position as a Patchogue official to wield power for his personal benefit. In addition, by these acts, Yannacone was also an accomplice to criminal impersonations by village personnel acting as police officers, mail and wire fraud, filing false instruments, extortion, and other illegal and improper activities. Yannacone acted outside his jurisdiction as village judge to impose fines and penalties on class members, including the named plaintiff, as part of the Scheme. Yannacone also acted beyond the jurisdiction of the Patchogue justice court as an accomplice to the other Defendants in coercing members of the class to pay money into the Scheme based on purported uniform traffic tickets issued by members of the Scheme in violation of the Hobbs Act and the New York larceny by extortion statute, NY Penal Law § 155.40(2)(c). Yannacone has personally benefitted from the Scheme including, not limited to, deriving income from the scheme.

82.   O'Connell, individually and in his official capacity as acting Justice of the Patchogue

Village Justice Court, along with other Defendants, acting beyond the jurisdiction of the

Patchogue village court, participated in and furthered the Scheme. O'Connell and the

other individual defendants  knew at all times that Patchogue had irrevocably assigned all

its police authority to Suffolk County and had been notified on multiple occasions by the

authorities that it could not exercise police authority.  O'Connell has been personally

involved in the management and control of the Scheme throughout the Class Period,

including acting with other Patchogue officials to setup and maintain the Scheme, procure

funding for the Scheme, and approve and/or supply the Scheme with uniforms, vehicles,

weapons, emblems, equipment, and other items necessary to facilitate operation of the

scheme.  O'Connell used his position as a Patchogue official to wield power for his

personal benefit.  In addition, by these acts, O'Connell was also an accomplice to

criminal impersonations by village personnel acting as police officers, mail and wire

fraud, filing false instruments, extortion, and other illegal and improper activities.

O'Connell acted outside his jurisdiction as village judge to impose fines and penalties on

class members, including the named plaintiff, as part of the Scheme. O'Connell also acted

beyond the jurisdiction of the Patchogue justice court as an accomplice to the other

Defendants in coercing members of the class to pay money into the Scheme based on

purported uniform traffic tickets issued by members of the Scheme in violation of the

Hobbs Act and New York's larceny by extortion statute, NY Penal Law § 155.40(2)(c).

O'Connell has personally benefitted from the Scheme including, not limited to, deriving

income from the scheme.

83.    Auer, Reilly, and Gustam have been personally involved in the management and control of the Scheme throughout the Class Period by maintaining records of purported citations and/or appearance tickets, issuing notices to persons detained by members of the Scheme, using the mails and wires on thousands of occasions in an attempt to collect unlawful fines and court costs imposed on individuals traveling through Patchogue as part of the Scheme, and using the mails and wires on thousands of occasions to collect monies on behalf of the Scheme as well as, on thousands of occasions, personally collecting monies on behalf of the Scheme. Auer, Reilly, and Gustam on thousands of occasions also personally sent out notices to class members based on the issuance of the purported citations and/or appearance tickets, in an effort to extort and/or coerce members of the class to pay monies into the Scheme. Auer, Reilly, and Gustam and the other individual defendants knew at all times that Patchogue had irrevocably assigned all its police authority irrevocably to Suffolk County and had been notified on multiple occasions by the authorities that it could not exercise police authority. Auer, Reilly, and Gustam used their positions as Patchogue officials to wield power for their personal benefit, and Auer, Reilly, and Gustam have personally benefitted from the Scheme including, not limited to, deriving income from the scheme.

84.    Berger, Pontieri, and Collocola have been personally involved in the management and control of the Scheme throughout the Class Period by maintaining records of purported citations and/or appearance tickets, issuing notices to persons detained by members of the Scheme, using the mails and wires. Berger, Pontieri, and Collocola and the other individual defendants knew at all times that Patchogue had irrevocably assigned all its

31

police authority to Suffolk County and had been notified on multiple occasions by the authorities that it could not exercise police authority. Berger, Pontieri, and Collocola were also accomplices to criminal impersonations by village personnel acting as police officers by filing false instruments, and other illegal and improper activities. Berger, Pontieri, and Collocola used their positions as Patchogue officials to wield power for their personal benefit, and Berger, Pontieri, and Collocola have personally benefitted from the Scheme including, not limited to, deriving income from the scheme.

**D.    The Defendants Had Knowledge That the Scheme Was Illegal.**

85.    Despite having given all authority to enforce state and local laws to Suffolk County in an irrevocable election, the Defendants created and continued their Scheme up to and including the present day.

86.    Defendants were well aware that Patchogue had transferred all authority to enforce state and local laws to Suffolk County and was therefore prohibited from using any mechanism to enforce these laws aside from the Suffolk County Police Department.

87.    Upon information or belief, in 1991, the Village of Patchogue and its high-level policy making officers – led by non-party Franklin Leavendosky who was the Mayor of the Village of Patchogue at that time – hatched the Scheme to create the Private Police Force, calling such the Constabulary, or Public Safety.  Upon information and belief, the decision was made in a private meeting held at the Knights of Columbus Hall attended by non-party Franklin Leavendosky and members of Patchogue's Business Improvement District and Chamber of Commerce.

32

88.    The New York State Division of Criminal Justice Services, by letter dated March 23,

1994, informed the mayor of Patchogue, Franklin Leavendosky, that Patchogue did not

have the authority to establish a constabulary and designate their constables as peace

officers.  In denying Patchogue's request to register their constables in the Peace Officer

Registry, the Commissioner stated that a Village constabulary would be in violation of

CPL 2.10(1) as being contrary to local law and controlling court decisions.

89.    In 1984, the New York Court of Appeals held that actions by an unauthorized village

constabulary were void.

90.    By letter date November 14, 1996, Edward Ihne (acting as 'Commissioner' of the Village

of Patchogue) made a request to the Division of Criminal Justice Services to allow

individuals to register as Patchogue Constables in the Peace Officer Registry.  The

Division denied the request and reminded Ihne that Patchogue was not a 'duly authorized

law enforcement agency'.

91.    In a letter dated June 23, 1998, the Suffolk County Civil Service Department informed

the Village of Patchogue that its Constables were not "police officers" or "law

enforcement officers", and that since their duties were limited to enforcement of village

code they are not authorized to enforce vehicle and traffic laws.

92.    In a letter dated January 11, 1999 addressed to Keegan, the Suffolk County Civil Service

Department informed the Village of Patchogue that Duties Statements for the positions of

Code Enforcement Officer and Senior Code Enforcement Officer which specified that the

officers could carry guns should not have been approved because these are not Police

Officer positions.  The Department admonished the Village to cease the practice of

33

allowing employees to carry guns while enforcing the village code and demanded that the Village respond with confirmation that the practice had ceased.   Keegan never responded, and Defendants have continued to allow the constables to carry guns while employed.

93.     In a letter dated March 2, 1999 the Civil Service Department cautioned the village that because Code Enforcement Officers are not Police Officers it was not appropriate for them to carry guns in the course of employment.  The department then requested that the village re-submit new Duties Statements to reflect the decision of the Department.  The Village has not submitted a new Duties Statement for its officers since 1998, and is in violation of state law.

94.     Defendants are also chargeable with the knowledge that the establishment of a private police force by a village who had previously conceded law enforcement jurisdiction to the county was illegal.  Two widely publicized lawsuits involving similar schemes in similarly situated villages were adjudicated by the state, one in 1967 involving the Village of Port Jefferson, and one in 1997 involving the Village of Old Field, and conclusively found such private police forces to be without any authority to enforce vehicle and traffic laws.  Nonetheless, Patchogue has continued to operate its private police Scheme.

95.     Based, *inter alia*, on these facts, the Defendants were aware that their Scheme was illegal and unauthorized, and their actions were not taken in good faith.

**E.     The Defendants Make Misrepresentations to the County to Facilitate Payment of Their Enforcement Officers Through the Civil Service System.**

34

96.     As part and parcel of the Scheme to defraud the class members, it was necessary for the individual defendants to be paid from the village treasury under the auspices of the New York state civil service system.  Under New York civil service law, money from the village treasury may only be paid to people who are employed in positions approved by the county civil service agency and who perform the duties and under titles which are authorized.  In particular, provisions needed to be made for paying individuals who would impersonate police officers and issue uniform traffic tickets, given that the Civil Service Department informed Patchogue in 1998 that the constable position was unauthorized and disapproved.

97.     Under New York's civil service laws, governmental entities are prohibited from employing persons in jobs or titles that are unapproved or unauthorized by law.  Payrolls are required to be certified as complying with the law, there must be an approved-duties statement for each employee, and all employees must confine themselves to their approved duties.

98.     In a letter dated June 23, 1998 the County Civil Service Department received information that Patchogue "constables" were enforcing state vehicle and traffic laws contrary to the Duty Statement that had been submitted by the Village.  The Department warned Patchogue that its Code Enforcement Officers were not authorized to enforce vehicle and traffic laws.  Then-mayor Keegan, in a written reply dated July 9, 1998, assured the Department that Patchogue Code Enforcement Officers only write tickets for code violations.  However, in a 12/2/99 grant application by the Village of Patchogue Justice

Court, the court stated that it had adjudicated over 6600 vehicle and traffic law citations, presumably issued by Patchogue Constables.

99.     Upon information and belief, during the period up to and including 1998 the Defendants have submitted certified annual payroll statements to the County Civil Service Department, certifying that the employees performed solely the duties as approved in the Duties Statements.  However, the Chief Constables, Kracht and Tomeo, the Mayors, Keegan and Ihne and the other elected policy level officials have allowed and directed the code enforcement officers to perform duties outside of their authority in enforcing vehicle and traffic laws.  The Defendants were representing one thing to the County while doing another.

100.    Patchogue had its officers sign duty statements approved by the Civil Service Department making it clear that the approved employment was for a non-law enforcement and non-traffic enforcement position. The Defendants certified to the Civil Service Department by United States mail that these individuals performed only the listed duties of their offices, but in reality, these individuals were hired as "constables" and performed extensive, if not exclusive, law-enforcement activities.

101.    In 1991, Patchogue submitted by U.S. mail proposed duties statements for code enforcement officers to the Civil Service Department that included holding a gun permit as a qualification of employment as a constable.  The Department, in 1999, informed the Defendants that the approvals were in error and that the department should cease immediately from allowing its officers to carry guns while employed.  Without disclosure to the County Civil Service Department, upon information and belief, the Defendants

used the mechanism of having its individual officers obtain individual gun permits to
circumvent the fact that Patchogue could not employ police officers or have code
enforcement officers carry handguns. Although the Department asked the Defendants to
confirm that the policy had been terminated, defendants never responded, its employees
continue to carry guns, and the Village has ceased submitting Duties Statements to the
County, in violation of state law, so that it may continue its scheme.

102.   All of these activities, by which the Defendants misrepresented facts to the County,
facilitated operation and continuation of the Scheme and were part and parcel of the
same.

**F.   Under Color of Official Right, the Individual Plaintiff is Detained and
Forced to Pay Monies by the Defendants.**

103.   On or about August 6, 1999, Schiebl was driving in Patchogue when she was detained by
a person claiming to be a Patchogue constable. Schiebl does not know the name of the
Patchogue constable that detained her. The constable was acting under color of official
right. The constable was driving a vehicle with a flashing red emergency light when he
pulled Schiebl over. He was wearing a police uniform with a badge, and was armed. The
constable held himself out as a police officer and informed Schiebl that she had violated
Vehicle and Traffic Law §1180(d). The constable gave Schiebl a document purporting to
be a citation for a traffic violation. The document was a "Uniform Traffic Ticket" form
that indicated the instrument was issued under the auspices of the State of New York
Department of Motor Vehicles even though the constable had no authority to issue such a
ticket. The constable inscribed upon the citation that the police agency issuing the ticket

37

was "P.V.", shorthand for Patchogue Village.  The purported citation stated "You are

hereby directed to appear" in the court operated by the Village of Patchogue on a

particular date to answer the charge.  The document also included the following language:

> A plea of guilty to this charge is equivalent to a conviction after trial.  If you are
> convicted, not only will you be liable to a penalty, but in addition your license to
> drive a motor vehicle or motorcycle, and your certificate of registration, if any, are
> subject to suspension and revocation as prescribed by law.  Upon conviction, you
> may be subject to a mandatory surcharge in the amount prescribed by law.  Your
> failure to respond may result in a warrant for your arrest or suspension of your
> driver license and/or a default judgment against you.

Because of the constable's appearance, manner, and representations, Schiebl believed the ticket

to be a legitimate traffic citation.  After being threatened by Patchogue officers that her driving

privileges would be taken away, Schiebl entered a plea of guilty to a different charge and paid a

fine in the amount of $90.00.  The presiding judge, Yannacone by virtue of his involvement in

the scheme and his personal interest in the outcome of the charges before him, was biased against

Schiebl and all other motorists.  Judge O'Connell was also involved in the scheme and was

biased against Schiebl and all other motorists.  While Schiebl purportedly plead "guilty" to a

charge, in fact there was no authorized charge before the village court, because the Defendants

had no authority to enforce the New York Vehicle and Traffic Law or, for that matter, any traffic

law or regulation.  Because there was no authorized charge before the village court, the village

court, and the partial presiding judge, was acting outside its jurisdiction in adjudicating the

purported charge, and to the extent that Schiebl's payment of the purported fine could be

construed as a guilty plea to an offense under the Vehicle and Traffic law, Schiebl's plea is a

nullity.

## Conditions Precedent

104.    All conditions precedent have been performed or have occurred.

### Count I - Declaratory Judgment
### (on behalf of all members of the Class
### Against All Defendants)

105.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if

more fully set forth below.

106.    Plaintiff requests a declaration that the referendum transferring all Patchogue's police

functions to the Suffolk County police district is binding on Patchogue as well as all those

in privity with Patchogue, including but not limited to, all the Defendants, that Patchogue

has no authority to operate a police force, detain and/or arrest any persons residing in or

traveling through Patchogue, or to empower anyone to enforce the New York Vehicle and

Traffic Law or Patchogue local ordinances, and that no one employed by or in association

with Patchogue has the authority or right to issue New York Uniform Traffic Tickets or

Simplified Traffic Informations.   Plaintiff also requests an award of costs and reasonable

and necessary attorney's fees as are equitable and just.

**Count II – Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. § 1962(b)**
**(on behalf of all members of the class described in paragraph 59(b) and 59(c)**
**against All Defendants)**

107.   Plaintiff incorporates and re-alleges the allegations set forth in the preceding paragraphs

as if fully set forth herein.

108.   This Count is brought on behalf of all members of the class described in paragraphs 59(b)

and 59(c) who were detained and ticketed by persons purporting to be Patchogue police

officers as described in this Complaint and suffered injury to their person or property

from January 16, 1998 to the present day.

109.   The Patchogue Village Justice Court constitutes an "enterprise" as that term is defined in

18 U.S.C. §§ 1961(4) and 1962(c) and within the meaning of 18 U.S.C. § 1962(a) and

(b).  This enterprise engages in activities that affect interstate commerce within the

meaning of 18 U.S.C. § 1962(c), including, but not limited to, utilizing the mails and

other forms of interstate communications.

110.   All of the Defendants, individually and collectively, maintained control over this

enterprise through a pattern of racketeering activity, as described above, which impacted

interstate commerce.  The Defendants, individually and collectively, controlled the

administration and operation of the Patchogue Village Justice Court, including creating

an accounting and collection system to extort and/or coerce members of the class into

paying unlawful fines, surcharges, and/or court costs, by use, *inter alia*, of the mails and

the wires, and collecting monies paid by members of the class.

111.   All Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c)

112.    Plaintiff and the other members of the class are "persons" within the meaning of 18
        U.S.C. § 1961(3) and for purposes of the civil remedies provision, 18 U.S.C. § 1964(c).

113.    In furtherance of the Patchogue Private Police Force Scheme, Taldone, O'Brien, Tomeo,
        Kracht, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich,
        Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan,
        Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland,
        Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe committed predicates acts
        involving extortion, by violating New York Penal Law section 190.65 (1)(1) Scheme to
        Defraud in the First Degree. Specifically, these Defendants engaged in a scheme
        constituting a systematic ongoing course of conduct with intent to defraud ten or more
        persons, or to obtain property from ten or more persons, by false or fraudulent pretenses,
        representations, or promises, namely that the class members would suffer adverse
        consequences to their driving records, livelihood, or financial interests should they not
        pay the fraudulent fines. The activities described in this paragraph include those
        described in the "Facts" section of this complaint, but are not limited to those specific
        actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this
        matter.

114.    In furtherance of the Patchogue Private Police Force Scheme, on numerous occasions
        during the Class Period, Berger, Pontieri, Collocola, Auer, Reilly, and Gustam committed
        predicate acts involving extortion by violating New York Penal Law section 190.65 (1)(1)
        Scheme to Defraud in the First Degree. Specifically, these Defendants engaged in a
        scheme constituting a systematic ongoing course of conduct with intent to defraud ten or

41

more persons, or to obtain property from ten or more persons, by false or fraudulent

pretenses, representations, or promises, namely that the class members would suffer

adverse consequences to their driving records, livelihood, or financial interests should

they not pay the fraudulent fines.  These Defendants created and distributed instruments

demanding payment of unlawful fines, surcharges, and/or court costs in connection with

the purported citations and/or appearance tickets and subsequently collected monies from

members of the class in connection with the purported citations and/or appearance tickets.

The activities described in this paragraph include those described in the "Facts" section of

this complaint, but are not limited to those specific actions inasmuch as the plaintiff has

not yet had the benefit of any discovery in this matter.

115.    In furtherance of the Patchogue Private Police Force Scheme, on numerous occasions

during the Class Period,  Yannacone, O'Connell, Keegan, Patchogue, Ihne, Kracht, and

Tomeo committed predicate acts involving extortion by violating New York Penal Law

section 190.65 (1)(1) Scheme to Defraud in the First Degree.  Specifically, these

Defendants engaged in a scheme constituting a systematic ongoing course of conduct

with intent to defraud ten or more persons, or to obtain property from ten or more

persons, by false or fraudulent pretenses, representations, or promises, namely that the

class members would suffer adverse consequences to their driving records, livelihood, or

financial interests should they not pay the fraudulent fines.  Yannacone, O'Connell,

Keegan, Patchogue, Ihne, Kracht, and Tomeo oversaw and managed the Scheme,

recruited individuals to act as constables and clerks to facilitate the filing of false

instruments as part of the Scheme, approved the procurement of and/or supplying the

42

equipment, emblems, uniforms, vehicles, and other items used to carry out the criminal

impersonation.  The activities described in this paragraph include those described in the

"Facts" section of this complaint, but are not limited to those specific actions inasmuch as

the plaintiff has not yet had the benefit of any discovery in this matter.

116.    In furtherance of the Patchogue Private Police Force Scheme, Taldone, O'Brien,  Tomeo,

Kracht,  Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich,

Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan,

Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland,

Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe committed further predicates

acts involving extortion, by violating New York Penal Law section § 155.40 Grand

Larceny in the Second Degree, which carries a penalty in excess of one year in jail.

Specifically, these Defendants stole or attempted to steal property from Plaintiff and other

class members through extortion by instilling a fear that they or another person will use

or abuse their position as a public servant by engaging in conduct within or related to

their official duties, or by failing or refusing to perform an official duty, in such a manner

as to affect some person adversely.  The activities described in this paragraph include

those described in the "Facts" section of this complaint, but are not limited to those

specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in

this matter.

117.    In furtherance of the Patchogue Private Police Force Scheme, Taldone, O'Brien,  Tomeo,

Kracht,  Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich,

Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan,

43

Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe committed predicate acts involving extortion, by violating New York Penal Law § 175.35 by offering false instruments for filing.  Specifically, on numerous occasions during the Class Period, these Defendants offered false instruments for filing when they prepared and filed instruments purporting to be "citations" and/or appearance tickets for alleged violations of the Vehicle and Traffic Law and/or Patchogue local ordinances.  Upon information and belief, these Defendants also offered false instruments for filing with the County of Suffolk when they applied for licenses to carry firearms, claiming they were for their own personal or business use when, in fact, they intended to use the firearms to impersonate police officers as part of the Scheme.

118.    In furtherance of the Patchogue Private Police Force Scheme, on numerous occasions during the Class Period, Berger, Pontieri, Collocola, Auer, and Reilly committed predicate acts involving extortion by violating New York Penal Law § 175.35 by offering false instruments for filing, which carries a penalty in excess of one year in jail, by preparing instruments for filing purporting to be official papers legitimizing the imposition of unlawful fines and surcharges on class members.  The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

119.    In furtherance of the Patchogue Private Police Force Scheme, on numerous occasions during the Class Period, Yannacone, O'Connell, Patchogue, Keegan, Ihne, Tomeo, and

44

Kracht committed predicate acts involving extortion by violating New York Penal Law § 20.00 and federal common law when, while sharing the mental state of the other defendants, they solicited, requested, commanded, importuned, or intentionally aided the other Defendants in violating New York Penal Law § 175.35, which carries a penalty in excess of one year in jail, by overseeing and managing the Scheme and recruiting individuals to act as constables and clerks to facilitate the filing of false instruments as part of the Scheme. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

120.    In furtherance of the Patchogue Private Police Force Scheme, Taldone, O'Brien, Tomeo, Kracht, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe violated New York Penal Law § 190.26, which carries a penalty in excess of one year in jail, by, continuously during the Class Period, engaging in criminal impersonation of police officers by pretending to be police officers, wearing or displaying without authority, any uniform, badge or other insignia or facsimile thereof, by which such police officers are lawfully distinguished, and/or expressing by their words or actions that they were acting with the approval or authority of any police department, with the intent to induce members of the class to submit to such pretended official authority or otherwise to act in reliance upon said pretense by issuing over 13,000 appearance tickets for vehicle and traffic law

violations, inscribed with the initials "P.V." indicating Patchogue Village as the police

agency issuing the ticket. Upon information and belief, these defendants continuously

during the Class Period, wore uniforms with shields and/or insignia identifying them as

police officers, displayed badges identifying them as police officers, drove automobiles

with shields and/or insignia identifying their cars as law-enforcement vehicles equipped

with sirens and flashing red lights, and issued more than 13,000 "citations" and/or

"appearance tickets" to members of the class during the Class Period. The activities

described in this paragraph include those described in the "Facts" section of this

complaint, but are not limited to those specific actions inasmuch as the plaintiff has not

yet had the benefit of any discovery in this matter.

121.  The criminal impersonation described above constituted a predicate act involving

extortion because Taldone, O'Brien, Tomeo, Kracht, Avellino, Barbara, Chirillo,

Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci,

Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson,

McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley,

Wood, Zambelli, and Doe threatened loss of driving privileges, arrest, fines, and other

injury to any motorist who disregarded the order in the appearance ticket to appear on the

date before the Patchogue Village. These Defendants' criminal impersonation constituted

a felony offense because they impersonated officers with the intent of committing another

felony-level crime, namely scheme to defraud in the first degree in violation of New York

Penal Law § 190.65. Specifically, these defendants impersonated police officers in

furtherance of their scheme to defraud ten or more persons, or to obtain property from ten

46

or more persons, by false or fraudulent pretenses or representations, which constituted

extortion.  The activities described in this paragraph include those described in the

"Facts" section of this complaint, but are not limited to those specific actions inasmuch as

the plaintiff has not yet had the benefit of any discovery in this matter.

122.   In addition to the conduct alleged in paragraph 121 above, the criminal impersonation

described above also constituted predicate acts involving extortion because Taldone,

O'Brien, Tomeo, Kracht, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta,

Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson,

Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio,

Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe

impersonated officers with the intent of committing another felony-level crime, namely,

grand larceny in the second degree, in violation of New York Penal Law §155.40(2)(c).

Specifically these defendants impersonated police officers in furtherance of their scheme

to steal property through extortion, committed by instilling a fear that they or another

person will use or abuse his position as a public servant by engaging in conduct within or

related to his official duties, or by failing or refusing to perform an official duty, in such a

manner as to affect some person adversely.  These defendants threatened Plaintiff and

other class members by issuing tickets in their position as a public servant and, thereby,

threatening loss of driving privileges, arrest, fines, and other injury to any motorist who

disregarded the order in the appearance ticket to appear on the date before the Patchogue

Village. The activities described in this paragraph include those described in the "Facts"

section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

123.    In furtherance of the Patchogue Private Police Force Scheme, Berger, Pontieri, Collocola, Auer, Gustam, and Reilly committed predicate acts by violating 18 U.S.C. § 1341. Specifically, having devised along with the other Defendants a scheme or artifice to defraud individuals traveling through Patchogue, for purposes of executing that scheme or artifice and/or attempting to do so, Berger, Pontieri, Collocola, Auer, Gustam, and Reilly, on thousands of occasions during the Class Period, placed in a mail depository for delivery by the post office or in a depository for delivery by any private or commercial interstate carrier documents including, but not limited to, communications regarding purported "citations" and/or appearance tickets issued by O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe who were impersonating police officers.  These communications included representations that unlawful fines, surcharges, and/or court costs were due and owing and threatening dire consequences to the class members if these assessments were not paid into the Scheme.  The mailings to the Class are part of the scheme to defraud the class members, and the object of the mailings was to maximize the number of people in the class who would respond and pay monies into the scheme as backups for the "appearance tickets" and to facilitate collection of the monies as part of the scheme.  Upon information and belief, these documents were

48

transmitted in connection with the issuance of more than 13,000 "appearance tickets" during the Class Period. O'Brien, Taldone, Kracht, Tomeo,   Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe aided and abetted this activity by impersonating police officers, detaining the class members, and issuing purported citations to the class members. Pursuant to 18 U.S.C. § 2, Yannacone, O'Connell, Keegan, , Ihne, Patchogue, Kracht, and Tomeo violated 18 U.S.C. § 1341 by overseeing and managing the Scheme, recruiting individuals to act as constables and clerks, and approving the procurement of and/or supplying the equipment, stationary, postage, and other items used to facilitate the transmittal of instruments through the mail as part of the Scheme to defraud the class members, as described above.  The defendants, including but not limited to Keegan, Ihne, Pontieri, Berger, and Collocola also transmitted at least a few dozen instruments through the mails between 1990 to the present to the County Civil Service Department as part of the Scheme as described in detail in the "Facts" section, subpart E, above.  These mailings are part of the scheme to defraud the members of the class, as they made it possible for the Defendants to continue the Scheme by allowing payment of the Defendants through the civil service system while the Defendants circumvented the restrictions imposed by the civil service system against unauthorized activities.  The activities described in this paragraph include those described in the "Facts" section of this

49

complaint, but are not limited to those specific actions inasmuch as the plaintiff has not

yet had the benefit of any discovery in this matter.

124.    In furtherance of the Patchogue Private Police Force Scheme, Berger, Pontieri, Collocola,

Auer, Gustam, and Reilly committed predicate acts by violating 18 U.S.C. § 1343.

Specifically, having devised along with the other Defendants a scheme or artifice to

defraud individuals traveling through Patchogue, and for purposes of executing that

scheme or artifice and/or attempting to do so, Berger, Pontieri, Collocola, Auer, Gustam,

and Reilly on thousands of occasions during the Class Period, transmitted or caused to be

transmitted by means of wire or radio communication in interstate commerce writings

and/or sounds including, but not limited to, writings and/or sounds regarding purported

"citations" and/or appearance tickets issued by O'Brien, Taldone, Kracht, Tomeo,

Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick,

Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen,

Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia,

Velez, Wattley, Wood, Zambelli, and/or Doe who were impersonating police officers,

including telephone calls and facsimile transmission of documents related to the efforts to

collect unlawful fines and costs associated with the purported citations issued to travelers.

These communications included assertions that unlawful fines, surcharges, and/or court

costs were due and owing and threatening dire consequences to the class members if

these assessments were not paid into the Scheme.  Upon information and belief, these

transmissions were made in connection with the issuance of more than 13,000

"appearance tickets" during the Class Period.  O'Brien, Taldone, Kracht, Tomeo,

50

Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe aided and abetted this activity by impersonating police officers, detaining the class members, and issuing purported citations to the class members. Pursuant to 18 U.S.C. § 2, Yannacone, O'Connell, Keegan, Ihne, Patchogue, Kracht, and Tomeo violated 18 U.S.C. § 1343 by overseeing and managing the Scheme, recruiting individuals to act as constables and clerks, and approving the procurement of and/or supplying the equipment and other items used to facilitate the transmissions as part of the Scheme as described above. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

125.   In furtherance of the Patchogue Private Police Force Scheme, O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe committed predicate acts involving extortion by violating 18 U.S.C. § 1951 by obstructing, delaying, or affecting commerce by extortion as defined in 18 U.S.C § 1951(b)(2) and/or attempting to do so by wrongful use of actual or threatened force, violence, or fear, or under color of official right continuously during the Class Period. The class members reasonably believed that

51

the Defendants were acting under color of official right, that the Defendants had the

power to harm the class members, that the Defendants would exploit that power to the

class members' detriment, and that nonpayment of purported fines and court costs would

result in economic detriment to the class members, including but not limited to, loss of

other impairment of driving privileges.  O'Brien, Taldone, Kracht, Tomeo, Avellino,

Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert,

Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks,

Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez,

Wattley, Wood, Zambelli, and Doe continuously during the Class Period, identified

themselves as police officers, wore uniforms with shields and/or insignia identifying

them as police officers, drove automobiles with shields and/or insignia identifying their

cars as law-enforcement vehicles equipped with sirens and flashing red lights, stopped

and detained members of the class, and issued more than 13,000 "citations" and/or

"appearance tickets" to members of the class during the Class Period, threatening

economic loss, including the potential loss or other impairment of driving privileges, to

obtain monies from members of the class.  Berger, Pontieri, Collocola, Auer, Gustam,

and Reilly, on thousands of occasions during the Class Period, transmitted or caused to be

transmitted by means of the mail, wire or radio communication in interstate commerce

writings and/or sounds including, but not limited to, writings and/or sounds regarding

purported "citations" and/or appearance tickets issued by O'Brien, Taldone, Kracht,

Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich,

Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan,

Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and/or Doe who were impersonating police officers, including telephone calls and facsimile transmission of documents related to the efforts to collect unlawful fines and costs associated with the purported citations issued to travelers. Said communications included assertions that unlawful fines, surcharges, and/or court costs were due and owing and threatening dire consequences to the class members if these assessments were not paid into the Scheme. Pursuant to 18 U.S.C. § 2, Yannacone, O'Connell, Keegan, Ihne, Patchogue, Kracht, and Tomeo violated 18 U.S.C. § 1951 by overseeing and managing the Scheme, recruiting individuals to act as constables and clerks to facilitate the filing of false instruments as part of the Scheme, approving the procurement of and/or supplying the equipment, emblems, uniforms, vehicles, and other items used to carry out the extortion. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

126.   In furtherance of the Patchogue Private Police Force Scheme,  O'Brien, Taldone, Kracht, Tomeo,   Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe committed predicate acts involving extortion by violating 18 U.S.C. § 1951.  Specifically, these defendants conspired to obstruct, delay, or affect commerce by extortion as defined in 18 U.S.C

53

§ 1951(b)(2) by wrongful use of actual or threatened force, violence, or fear, or under color of official right continuously during the Class Period. The class members reasonably believed that the Defendants were acting under color of official right, that the Defendants had the power to harm the class members, that the Defendants would exploit that power to the class members' detriment, and that nonpayment of purported fines and court costs would result in economic detriment to the class members, including but not limited to, loss or other impairment of driving privileges. O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe continuously during the Class Period, agreed to identify themselves as police officers, agreed to wear uniforms with shields and/or insignia identifying them as police officers, agreed to drive automobiles with shields and/or insignia identifying their cars as law-enforcement vehicles equipped with sirens and flashing red lights, agreed to stop and detain members of the class, and agreed to issue "citations" and/or "appearance tickets" to members of the class during the Class Period, agreed to threaten economic loss, including the potential loss or other impairment of driving privileges, to obtain monies from members of the class . Berger, Pontieri, Collocola, Auer, Gustam, and Reilly agreed to transmit or cause to be transmitted by means of the mail, wire or radio communication in interstate commerce writings and/or sounds including, but not limited to, writings and/or sounds regarding purported "citations" and/or appearance tickets issued by O'Brien, Taldone,

Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe who were impersonating police officers, including telephone calls and facsimile transmission of documents related to the efforts to collect unlawful fines and costs associated with the purported citations issued to travelers. Berger, Pontieri, Collocola, Auer, Gustam, and Reilly agreed to include in said communications assertions that unlawful fines, surcharges, and/or court costs were due and owing and threatening dire consequences to the class members if these assessments were not paid into the Scheme. Yannacone, O'Connell, Keegan, Ihne, Patchogue, Kracht, and Tomeo agreed to oversee and manage the Scheme, agreed to recruit individuals to act as constables and clerks to facilitate the filing of false instruments as part of the Scheme, agreed to approve the procurement of and/or supplying the equipment, emblems, uniforms, vehicles, and other items used to carry out the extortion. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter. With respect to all the activities described in this paragraph, each of the Defendants knowingly participated in the conspiracy to obstruct, delay, or affect commerce by extortion by wrongful use of actual or threatened force, violence, or fear, or under color of official right and acted with knowledge and/or understanding that the object of the conspiracy

55

was to obstruct, delay, or affect commerce by extortion by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

127.   The unlawful conduct described above constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962, for which actual, nominal and treble damages, injunctive relief, costs of the suit, and attorney's fees may be sought under 18 U.S.C. § 1964(c). The Defendants' criminal conduct forms a pattern because it embraces criminal acts that have the same or similar purposes, results, participants, victims, and/or methods of commission, the conduct is interrelated, and the Defendants' activities in furtherance of the Scheme are not isolated events.  The Defendants' criminal conduct has been ongoing and continuous from at least 1991 until the present day.

128.   As described above, Yannacone, Keegan, Ihne, Patchogue, Kracht, and Tomeo, along with the other Defendants, maintained control over the Patchogue Village Justice Court through a pattern of racketeering activity by, *inter alia*, continuously during the Class Period, personally overseeing the administration and operation of the Patchogue Village Justice Court, including hiring and equipping the "constables" who issued purported appearance tickets processed and "adjudicated" by the Village Justice Court,  hiring and providing infrastructure in support of the village clerks, and controlling the financial affairs of the Village Justice Court.  The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

129.   As described above, O'Brien, Taldone, Kracht, Tomeo,   Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe along with other Defendants, maintained control over the Scheme through a pattern of racketeering activity by, *inter alia*, representing themselves as legitimate police officers even though they were not recognized under New York law as police officers or otherwise legitimately empowered to enforce any laws or to detain persons traveling through Patchogue by means of "arrests" and issuing purported citations to persons traveling through Patchogue and appearing in the Village Justice Court to testify regarding the purported "offenses" of the class members.  The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

130.   As described above, Berger, Pontieri, Collocola, Auer, Gustam, and Reilly, along with the other Defendants, maintained control over the Patchogue Village Justice Court through a pattern of racketeering activity,  by, *inter alia,* on thousands of occasions during the Class Period, maintaining records of purported citations and/or appearance tickets, issuing notices to persons detained by other Defendants, using the mails and wires in an attempt to collect unlawful fines, surcharges, and/or court costs imposed on individuals traveling through Patchogue, and collecting monies. Berger, Pontieri, Collocola, Auer, Gustam, and Reilly, on thousands of occasions during the Class Period, personally sent out notices

57

to class members based on the issuance of the purported citations and/or appearance tickets, in an effort to extort and/or coerce members of the class to pay monies and collected monies paid by members of the class. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

131.    As a result of the Defendants' violations of 18 U.S.C. § 1962(b), Schiebl, and the other class members were injured in their business or property through the pattern of racketeering activity undertaken in association with the Patchogue Village Justice Court in that Schiebl and the class members were, *inter alia,* coerced into being absent from their jobs or schools and incurring travel expenses and related costs to appear in the Village Justice Court. These injuries are separate and independent of injuries described in Counts III and IV.

132.    The Defendants violated 18 U.S.C. § 1962(b) by maintaining control over the Patchogue Village Justice Court, which is engaged in or has an effect upon interstate commerce, through a pattern of racketeering activity for which treble damages, costs of the suit, and attorney's fees are required under 18 U.S.C. 1964(c). The Defendants' criminal conduct forms a pattern because it embraces criminal acts that have the same or similar purposes, results, participants, victims, and/or methods of commission, the conduct is interrelated, and the Defendants activities in furtherance of the Scheme are not isolated events. The Defendants' criminal conduct has been ongoing and continuous from at least 1991 until the present day and presents an ongoing threat.

**Count III – Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. § 1962(c)**
**(on behalf of all members of the class described in paragraph 59(b) and 59(c)**
**against Berger, Pontieri, Collocola, Auer, Gustam, Reilly, Yannacone,**
**O'Connell, Keegan, Ihne, Kracht, and Tomeo)**

133. Plaintiff incorporates and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

134. This Count is brought on behalf of all members of the class described in paragraph 59(b) and 59(c) who suffered an injury to their person or property from January 16, 1998 to the present day as a result of being detained and ticketed by persons purporting to be Patchogue police officers as described in this Complaint.

135. Plaintiff further incorporates and re-alleges the allegations set forth in Count II of the Complaint that establish the Defendants' predicate acts as if fully set forth herein.

136. The Patchogue Constabulary (a/k/a the Patchogue Police Department or the Patchogue Code Enforcement Department) constitutes an "enterprise" as that term is defined in 18 U.S.C. §§ 1961(4) and 1962(c). This enterprise engages in activities that affect interstate commerce within the meaning of 18 U.S.C. § 1962(c), including, but not limited to, utilizing the mails and other forms of interstate communications. The enterprise has been in existence since at least 1991, and the enterprise is continuing and ongoing. This enterprise engages in interstate commerce by, *inter alia*, utilizing the mails and other forms of interstate communications. The Patchogue Constabulary functions as a continuing unit with established duties and is made up of those individuals who, continuously during the Class Period, have engaged in the criminal impersonation of police officers and attempted to enforce, *inter alia*, the New York Vehicle and Traffic

59

Law, as described in the "Facts" section of this complaint.  The Patchogue Constabulary
has a definable hierarchy and structure, with, at various times, Kracht or Tomeo
exercising direct supervisory authority over the employees and/or agents of the
Constabulary while themselves engaging in criminal impersonation of police officers.
The Patchogue Constabulary is an enterprise distinct from the complained-of behavior
that can exist separate and apart from that behavior because, even in the absence of that
behavior, the Patchogue "constables" could properly be designated as code-enforcement
officers to enforce non-traffic related local ordinances.

137.    As described above, in furtherance of the Patchogue Private Police Force Scheme,
Berger, Pontieri, Collocola, Auer, Gustam, Reilly, Yannacone, O'Connell, Keegan, Ihne,
Kracht, and Tomeo, in violation of 18 U.S.C. § 1962(c), directly or indirectly participated
in and conducted the affairs of the Patchogue Constabulary through a pattern of
racketeering activity for which actual, nominal, and treble damages, injunctive relief,
costs of the suit, and attorney's fees are required under 18 U.S.C. 1964(c).

138.    As described above, Yannacone, O'Connell, Keegan, Ihne, Kracht, and Tomeo, acting
outside the scope of the legitimate business of Patchogue, directly or indirectly
participated in and conducted the affairs of the Patchogue Constabulary through a pattern
of racketeering activity by, *inter alia*, continuously during the Class Period, personally
overseeing the administration and operation of the Patchogue Constabulary, including
hiring and equipping the "constables", directing, managing, and influencing the efforts of
the Patchogue Constabulary to enforce New York laws, hiring and providing
infrastructure to support the imposition and collection of "fines" on members of the class,

and controlling the financial affairs of the Patchogue Constabulary. Berger, Pontieri,

Collocola, Auer, Gustam, and Reilly, acting outside the scope of the legitimate business

of Patchogue, directly or indirectly participated in and conducted the affairs of the

Patchogue Constabulary through a pattern of racketeering activity by, *inter alia,* on

thousands of occasions during the Class Period, maintaining records of purported

citations and/or appearance tickets, issuing notices to persons detained by the Patchogue

Constabulary, using the mails and wires in an attempt to collect unlawful fines,

surcharges, and/or court costs imposed on individuals traveling through Patchogue by the

Patchogue Constabulary, and collecting monies on behalf of the Patchogue Constabulary.

Berger, Pontieri, Collocola, Auer, Gustam, and Reilly, acting outside the scope of the

legitimate business of Patchogue, on thousands of occasions during the Class Period,

personally sent out notices to class members based on the issuance of the purported

citations and/or appearance tickets, in an effort to extort and/or coerce members of the

class to pay monies based on purported citations and/or appearance tickets, and collected

monies paid by members of the class. The activities described in this paragraph include

those described in the "Facts" section of this complaint, but are not limited to those

specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in

this matter.

139. As a result of the Defendants' violations of 18 U.S.C. § 1962(c), Schiebl and the other

class members were injured in their business or property through the pattern of

racketeering activity undertaken in association with the Patchogue Private Police Force

61



Scheme in that Schiebl and the class members were extorted and/or coerced to pay money into the Scheme.

140.    The Defendants violated 18 U.S.C. § 1962(c) by directly or indirectly participating in or conducting the business and affairs of the Patchogue Private Police Force Scheme through a pattern of racketeering activity for which treble damages, costs of the suit, and attorney's fees are required under 18 U.S.C. 1964(c).

### Count IV – Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962(d)
### (on behalf of all members of the class described in paragraph
### 59(b) and 59(c) against All Defendants)

141.    Plaintiff incorporates and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

142.    This Count is brought on behalf of all members of the class described in paragraph 59(b) and 59(c) who suffered an injury to their person or property as a result of being detained and ticketed by persons purporting to be Patchogue police officers as described in this Complaint from January 16, 1998 to the present day.

143.    Plaintiff further incorporates and re-allege the allegations set forth in Count II of the Complaint that establish the Defendants' predicate acts as if fully set forth herein.

144.    In furtherance of the Patchogue Private Police Force Scheme as described above, the Defendants, in violation of 19 U.S.C. § 1962(d), conspired to violate sections 1962(a), 1962(b), and 1962(c) of Title 18 of the United States Code for which actual, nominal, and treble damages, injunctive relief, costs of suit, and attorney's fees are required under 18 U.S.C. §1964(c).

62

145.   Upon information and belief, this conspiracy began no later than 1991 and continues to
this day.  The object of the conspiracy is to use the mechanism of a private police force
posing as an officially-authorized law enforcement agency to deprive individuals,
including the class members, of money and property by purporting to enforce the New
York Vehicle and Traffic Law and Patchogue local ordinances and thereby extort and/or
coerce the class members into paying money into the Scheme. Each of the Defendants
knowingly participated in the conspiracy, and each of the Defendants agreed, at the time
each one became a part of the Scheme, to form and associate together for the purpose and
objective of using the mechanism of a private police force posing as an
officially-authorized law enforcement agency to deprive individuals, including the class
members, of money and property by purporting to enforce the New York Vehicle and
Traffic Law and Patchogue local ordinances and thereby extort and/or coerce the class
members into paying money into the Scheme.

146.   In furtherance of the conspiracy, the Defendants agreed to conceive and create the private
police force and the supporting structure to extort and/or coerce payment of monies by the
class members, and the Defendants all agreed to conduct the affairs of Patchogue through
a pattern of racketeering activity.  All of the Defendants agreed to the commission of the
acts described in this section on behalf of their conspiracy to violate federal racketeering
laws.

147.   In furtherance of the conspiracy, O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara,
Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly,
Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks,

63

Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez,

Wattley, Wood, Zambelli, and Doe agreed to violate New York Penal Law section 190.65

Scheme to Defraud in the First Degree.  Specifically, these Defendants engaged in a

scheme constituting a systematic ongoing course of conduct with intent to defraud ten or

more persons, or to obtain property from ten or more persons, by false or fraudulent

pretenses, representations, or promises, namely that the class members would suffer

adverse consequences to their driving records, livelihood, or financial interests should

they not pay the fraudulent fines.

148.   In furtherance of the conspiracy, Taldone, O'Brien,  Tomeo, Kracht, Avellino, Barbara,

Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly,

Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks,

Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez,

Wattley, Wood, Zambelli, and Doe agreed to violate New York Penal Law section §

155.40 Grand Larceny in the Second Degree.  Specifically, these defendants stole or

attempted to steal property from Plaintiff and other class members through extortion by

instilling a fear that they or another person will use or abuse their position as a public

servant by engaging in conduct within or related to their official duties, or by failing or

refusing to perform an official duty, in such a manner as to affect some person adversely.

149.   In furtherance of the conspiracy, O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara,

Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly,

Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks,

Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez,

Wattley, Wood, Zambelli, and Doe agreed to violate New York Penal Law § 175.35 by

offering false instruments for filing. Specifically, these defendants, on thousands of

occasions during the Class Period, agreed to offer false instruments for filing by preparing

and filing instruments purporting to be "citations" and/or appearance tickets for alleged

violations of the Vehicle and Traffic Law and/or Patchogue local ordinances. Further,

upon information and belief, these defendants also agreed to offer false instruments for

filing with the County of Suffolk when they applied for licenses to carry firearms,

claiming they were for their own personal or business use when, in fact, they intended to

use the firearms to impersonate police officers as part of the Scheme. The activities

described in this paragraph include those described in the "Facts" section of this

complaint, but are not limited to those specific actions inasmuch as the plaintiff has not

yet had the benefit of any discovery in this matter.

150. In furtherance of the conspiracy Berger, Pontieri, Collocola, Auer, Gustam, and Reilly

agreed to violate New York Penal Law § 175.35 by offering false instruments for filing,

which carries a penalty in excess of one year in jail, by, on thousands of occasions during

the Class Period, preparing instruments for filing purporting to be official papers that

purported to legitimize the imposition of unlawful fines and surcharges on class

members. The activities described in this paragraph include those described in the

"Facts" section of this complaint, but are not limited to those specific actions inasmuch as

the plaintiff has not yet had the benefit of any discovery in this matter.

151. In furtherance of the conspiracy, Yannacone, O'Connell, Keegan, Ihne, Patchogue,

Kracht, and Tomeo agreed to violate New York Penal Law § 20.00 and federal common

65

law when, while sharing the mental state of the other defendants, they agreed to solicit, request, command, importune, or intentionally aid the other Defendants in violating New York Penal Law § 175.35, by overseeing and managing the Scheme, recruiting individuals to act as constables and clerks, and approving the procurement of and/or supplying the equipment and other items used to facilitate the filing of false instruments as part of the Scheme.  The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

152.   In furtherance of the conspiracy, O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe agreed to violate New York Penal Law § 190.26, by pretending to be police officers, wearing or displaying without authority, any uniform, badge or other insignia or facsimile thereof, by which such police officers are lawfully distinguished, and/or expressing by their words or actions that they were acting with the approval or authority of any police department, with the intent to induce members of the class to submit to such pretended official authority or otherwise to act in reliance upon said pretense.  In the course of their impersonation, these Defendants intended to commit another felony-level offense, namely scheme to defraud in the first degree in violation of New York Penal Law section 190.65 (1)(1).   Specifically, these Defendants impersonated officers in order to defraud ten or more persons, or to obtain property from

ten or more persons by false or fraudulent pretenses, representations, or promises.  In the

alternative, these Defendants also impersonated officers with the intent to commit the

felony-level offense of grand larceny in the second degree in violation of New York

Penal Law §155.40(2)(c).  Specifically, these defendant stole or attempted to steal

property through extortion, by instilling a fear that they or another person will use or

abuse their position as a public servant by engaging in conduct within or related to their

official duties, or by failing or refusing to perform an official duty, in such a manner as to

affect some person adversely.  Upon information and belief, these defendants agreed, on

thousands of occasions during the Class Period, to wear uniforms with shields and/or

insignia identifying them as police officers, drive automobiles with shields and/or

insignia identifying their cars as law-enforcement vehicles equipped with sirens and

flashing red lights, and issue more than 13,000 "citations" and/or "appearance tickets" to

members of the class during the Class Period.

153.   In furtherance of the conspiracy, Berger, Pontieri, Collocola, Auer, Gustam, and Reilly

acted as accomplices to the impersonation of police officers.  Specifically, these

defendants, while sharing the mental state of the other defendants, solicited, requested,

commanded, importuned, or intentionally aided O'Brien, Taldone, Kracht, Tomeo,

Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick,

Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen,

Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia,

Velez, Wattley, Wood, Zambelli and Doe's  impersonation of police officers by creating

and distributing instruments demanding payment of unlawful fines, surcharges, and/or

court costs in connection with the purported citations and/or appearance tickets. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

154.   In furtherance of the conspiracy, Yannacone, O'Connell, Keegan, Ihne, Patchogue, Kracht, and Tomeo agreed to violate New York Penal Law § 20.00 and federal common law when, while sharing the mental state of the other defendants, they agreed to solicit, request, command, importune, or intentionally aid the other Defendants in impersonating police officers in violation of New York Penal Law § 190.26, by overseeing and managing the Scheme, recruiting individuals to act as constables and clerks, approving the procurement of and/or supplying the equipment, emblems, uniforms, vehicles, and other items used to carry out the criminal impersonation. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

155.   In furtherance of the conspiracy, Berger, Pontieri, Collocola, Auer, Gustam, and Reilly agreed to violate 18 U.S.C. § 1341.  Specifically, these Defendants, having devised along with the other Defendants a scheme or artifice to defraud individuals traveling through Patchogue, and for purposes of executing that scheme or artifice and/or attempting to do so, on thousands of occasions during the Class Period, agreed to place in a mail depository for delivery by the U.S. post office or in a depository for delivery by any private or commercial interstate carrier documents including, but not limited to,

68

communications regarding purported "citations" and/or appearance tickets issued by O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe who were impersonating police officers. Said communications included representations that unlawful fines, surcharges, and/or court costs were due and owing and threatening dire consequences to the class members if these assessments were not paid into the Scheme. Upon information and belief, these documents were transmitted in connection with the issuance of more than 13,000 "appearance tickets" during the Class Period. O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe agreed to aid and abet this activity by impersonating police officers, detaining the class members, and issuing purported citations to the class members. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

156.    In furtherance of the conspiracy, pursuant to 18 U.S.C. § 2, Yannacone, O'Connell, Keegan, Ihne, Patchogue, Kracht, and Tomeo agreed to violate 18 U.S.C. § 1341 by overseeing and managing the Scheme, recruiting individuals to act as constables and

clerks, approving the procurement of and/or supplying the equipment, stationary, postage, and other items used to facilitate the transmittal of instruments through the mail as part of the Scheme to defraud the class members, as described above. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

157. The defendants, including but not limited to Berger, Pontieri, Collocola, Keegan, and Ihne, also agreed to transmit scores of instruments through the mails from 1991 to the present to the County Civil Service Department as part of the Scheme as described in detail in the "Facts" section, subpart E, above. These mailings are part of the scheme to defraud the members of the class, as they made it possible for the Defendants to continue the Scheme by allowing payment of the Defendants through the civil service system. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

158. In furtherance of the conspiracy, Berger, Pontieri, Collocola, Auer, Gustam, and Reilly agreed to violate 18 U.S.C. § 1343. Specifically, these Defendants, having devised along with the other Defendants a scheme or artifice to defraud individuals traveling through Patchogue, and for purposes of executing that scheme or artifice and/or attempting to do so, on thousands of occasions during the Class Period, agreed to transmit or cause to be transmitted by means of wire or radio communication in interstate commerce writings and/or sounds including, but not limited to, writings and/or sounds regarding purported

70

"citations" and/or appearance tickets issued by O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and/or Doe who were impersonating police officers, including telephone calls and facsimile transmission of documents related to the efforts to collect unlawful fines and costs associated with the purported citations issued to travelers. Said communications included assertions that unlawful fines, surcharges, and/or court costs were due and owing and threatening dire consequences to the class members if these assessments were not paid into the Scheme. Upon information and belief, these transmissions were made in connection with the issuance of more than 13,000 "appearance tickets" during the Class Period. O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe agreed to aid and abet this activity by impersonating police officers, detaining the class members, and issuing purported citations to the class members. The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

71

159. In furtherance of the conspiracy, pursuant to 18 U.S.C. § 2, Yannacone, O'Connell, Keegan, Ihne, Patchogue, Kracht, and Tomeo agreed to violate 18 U.S.C. § 1343 by overseeing and managing the Scheme, recruiting individuals to act as constables and clerks, approving the procurement of and/or supplying the equipment and other items used to facilitate the transmissions as part of the Scheme to defraud the class members, as described above. The defendants, including but not limited to Berger, Pontieri, Collocola, Keegan, and Ihne also agreed to transmit via wire or radio communication thousands of statements between 1991 to the present to the County Civil Service Department as part of the Scheme as described in detail in the "Facts" section above. These transmissions are part of the scheme to defraud the members of the class, as they made it possible for the Defendants to continue the Scheme by allowing payment of the Defendants through the civil service system.   The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

160. In furtherance of the conspiracy, O'Brien, Taldone, Kracht, Tomeo,  Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe agreed to violate 18 U.S.C. § 1951.  Specifically, these Defendants agreed to obstruct, delay, or affect commerce by extortion as defined in 18 U.S.C § 1951(b)(2) and/or to commit larceny by extortion under New York Penal Law

72

§155.40(2)(c) or  agreed to attempt to do so by wrongful use of actual or threatened force, violence, or fear, or under color of official right continuously during the Class Period. The class members reasonably believed that the Defendants were acting under color of law, that the Defendants had the power to harm the class members, that the Defendants would exploit that power to the class members' detriment, and that nonpayment of purported fines and court costs would result in economic detriment to the class members, including but not limited to, detrimental effects on the class members driving privileges. O'Brien, Taldone, Kracht, Tomeo,   Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe continuously during the Class Period, agreed to identify themselves as police officers, agreed to wear uniforms with shields and/or insignia identifying them as police officers, agreed to drive automobiles with shields and/or insignia identifying their cars as law-enforcement vehicles equipped with sirens and flashing red lights, agreed to stop and detain members of the class, and agreed to issue more than 13,000 "citations" and/or "appearance tickets" to members of the class during the Class Period, threatening economic loss, including the potential loss of driving privileges, to obtain monies from members of the class.  Pontieri, Collocola, Auer, Gustam, and Reilly, on thousands of occasions during the Class Period, agreed to transmit or cause to be transmitted by means of the mail, wire or radio communication in interstate commerce writings and/or sounds including, but not limited to, writings and/or sounds regarding purported "citations"

and/or appearance tickets issued by O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, and Doe  who were impersonating police officers, including telephone calls and facsimile transmission of documents related to the efforts to collect unlawful fines and costs associated with the purported citations issued to travelers.  Said communications included assertions that unlawful fines, surcharges, and/or court costs were due and owing and threatening dire consequences to the class members if these assessments were not paid into the Scheme.  Yannacone, O'Connell, Keegan, Ihne, Patchogue, Kracht, and Tomeo agreed to oversee and manage the Scheme, agreed to recruit individuals to act as constables and clerks to facilitate the filing of false instruments as part of the Scheme, agreed to approve the procurement of and/or supplying the equipment, emblems, uniforms, vehicles, and other items used to carry out the extortion.  The activities described in this paragraph include those described in the "Facts" section of this complaint, but are not limited to those specific actions inasmuch as the plaintiff has not yet had the benefit of any discovery in this matter.

161.   As a result of the Defendants' violations of 18 U.S.C. § 1962(d), Schiebl and the other members of the class were injured in their business or property as a result of one or more overt acts undertaken in furtherance of the Defendants' conspiracy to violate 18 U.S.C. § 1962(d) in that they were extorted and/or coerced into paying monies into the Scheme.

74

162.    The Defendants' unlawful conduct described above constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962, for which actual, nominal, and treble damages, injunctive relief, costs of the suit, and attorney's fees are required may be sought under 18 U.S.C. § 1964(c).

### Count V - 42 U.S.C. § 1983
### (on behalf of all members of the Class
### against All Defendants)

163.    Plaintiff incorporates and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

164.    This Count is brought on behalf of all members of the class who were detained by persons purporting to be Patchogue police officers as described in this Complaint from January 16, 1999 to the present day.

165.    Defendants are state actors acting illegally under color of state law to deprive Schiebl and the other class members of their rights under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

166.    Specifically, Defendants are all state actors as defined under 42 U.S.C. § 1983.  The Defendants, individually and in their official capacities, have denied Schiebl and the other class members property rights and liberty interests without due process as required under the Fourteenth Amendment and purporting to impose unlawful fines, surcharges, and/or court costs threatening dire consequences if these monies were not paid.

167.    The Defendants, individually and in their official capacities, have denied Schiebl and the other class members their rights under the Fourth Amendment and the Fourteenth Amendment by unlawfully detaining Schiebl and other class members without authority

75



to do so.  These actions are part of an official custom, practice, and/or policy of Patchogue.

168.  The Defendants, including but not limited to Patchogue, have negligently hired and employed individuals purporting to be law enforcement officers who are inadequately trained, and the Defendants, including but not limited to Patchogue, have failed to adequately supervise those individuals.  These actions are part of an official custom, practice, and/or policy of Patchogue.

169.  The Defendants, by their actions as described above, are acting in willful disregard of or acting with deliberate indifference to clearly established constitutional rights of which a reasonable person would have known.

170.  The Defendants were fully aware that Patchogue had transferred all authority to enforce state and local laws to Suffolk County and was therefore prohibited from using any mechanism to enforce these laws aside from the Suffolk County Police Department. Patchogue is liable for this conduct because, *inter alia*, Yannacone, O'Connell, Keegan, and Ihne, as policymakers for Patchogue, had final policymaking authority over the creation and implementation of the Scheme, they ratified the actions of O'Brien, Taldone, Kracht, Tomeo, Avellino, Barbara, Chirillo, Costello, Cuozzo, DeBetta, Donadio, Donovich, Durinick, Eckert, Evrly, Fiorucci, Gonzalez, Hart, Henderson, Holcombe, Lenox, Logan, Makinen, Marks, Matson, McFarlan, Nudo, Panuccio, Peterson, Ralph, Ramsland, Sabellichi, Stoia, Velez, Wattley, Wood, Zambelli, Doe, Berger, Pontieri, Collocola, Auer, Gustam, and Reilly, and they acted with deliberate indifference to constitutional violations being committed by the other defendants. Keegan, Ihne, Kracht,

and Tomeo are also individually liable for this conduct because they were each aware that there was a grave risk of harm to the class members posed by the Scheme, they had actual and/or constructive knowledge of that risk, and they failed to take easily available measures to address the risk.

171.   Schiebl and the other class members are entitled to recover actual, nominal and punitive damages caused by this deprivation of rights, as well as attorney's fees as provided by 42 U.S.C. § 1988.

**COUNT VI – Common Law Money Had and Received**
**(on behalf of all members of the class described in paragraph**
**59(c) against all Defendants Except O'Connell)**

172.   Plaintiff incorporates and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

173.   This Count is brought on behalf of all members of the class described in paragraph 59(c) who were detained and ticketed by persons purporting to be Patchogue police officers and paid money to the Defendants as described in this Complaint from January 16, 1996 to the present day.

174.   By virtue of their scheme of using individuals, acting under color of official right, purporting to be police officers to issue "citations" and demand payment of unlawful fines, surcharges, and/or court costs and threatening dire consequences for failure to pay the unlawful fines, surcharges, and/or costs, and by the imposition of directives by the village justice court in these matters where it had no jurisdiction, defendants received money belonging to the members of the class.  The Defendants were fully aware that Patchogue had transferred all authority to enforce state and local laws to Suffolk County

77

and was therefore prohibited from using any mechanism to enforce these laws aside from the Suffolk County Police Department. As described in the "Facts" section of this Complaint, the Defendants were informed on numerous occasions beginning in at least 1994 that their actions were illegal and unauthorized, and their actions were therefore not taken in good faith.

175. Defendants individually benefitted from receipt of money belonging to members of the class.

176. Patchogue assigned all its authority to enforce the Vehicle and Traffic Law and local ordinances to Suffolk County and therefore had no authority or right to enforce these laws by definition against members of the class or extort and/or coerce payment of such unlawful fines, surcharges, and/or court costs. Under principles of equity and good conscience, Defendants should not be permitted to keep the money they received from members of the class.

177. By reason of the foregoing, the class members have been damaged.

**Request for Permanent Injunction and Appointment of Monitor**

178. Plaintiff incorporates and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

179. Plaintiff asks the Court to issue a permanent injunction against the Defendants enjoining them from any further efforts by Patchogue to enforce the Vehicle and Traffic Law or local ordinances in any manner other than through the Suffolk County Police Department, and from employing constables or people having other law-enforcement-related titles to perform the same or similar functions. Plaintiff also asks this Court to appoint a federal

monitor to oversee the dismantling of the Patchogue private police force and ensure that

no future illegal activity takes place.

## JURY DEMAND

180.    Plaintiff demands a trial by jury as to all issues in this case.

### Prayer

WHEREFORE, Plaintiff Eileen A. Schiebl, on behalf of herself and all other

members of the class, prays for the following relief:

1)    actual damages from all Defendants except Yannacone, in his capacity as judge, and O'Connell, in his official capacity as a judge

2)    nominal damages from all Defendants except Yannacone and O'Connell;

3)    actual damages against all defendants, including against Yannocone in his non-judicial capacity or for his non-judicial acts.

4)    punitive damages from all Defendants except the Incorporated Village of Patchogue, Yannacone and O'Connell;

5)    a trebling of actual damages under 18 U.S.C. 1961 *et seq.*;

6)    issuance of an injunction enjoining Defendants from benefitting from their wrongful acts;

7)    issuance of a declaration as prayed for in Count I;

8)    appointment of a federal monitor by the Court to oversee the dismantling of the Patchogue Private Police Force Scheme and ensure that there are no future violations of the law;

9)    attorney's fees and costs;



10)    and such other and further relief to which Plaintiff may be justly entitled.

Dated:      Melville, New York             Respectfully Submitted,
            January 15, 2002

                                           SCOTT & SCOTT, L.L.P.
                                           Attorneys for plaintiffs

                                           By: _____

                                               Jonathan C. Scott (JCS 0813)
                                               Robert J. Scott (RJS 2861)
                                               999 Walt Whitman Road
                                               Melville, NY 11747
                                               (631) 271-6448